**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MELVYN KLEIN, Derivatively on Behalf of 22ND CENTURY GROUP, | Civil Action No.: 19-748 |
| Plaintiff, | **VERIFIED SHAREHOLDER AMENDED DERIVATIVE COMPLAINT** |
| vs. | |
| HENRY SICIGNANO, III, RICHARD M. SANDERS, JOSEPH ALEXANDER DUNN, NORA B. SULLIVAN, JAMES W. CORNELL, and JOHN T. BRODFUEHRER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| 22ND CENTURY GROUP, | |
| Nominal Defendant. | |

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant 22nd Century Group ("22nd Century" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by 22nd Century with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of 22nd Century against certain of its officers and directors seeking to remedy Defendants' violations

of state and federal law that have occurred from February 18, 2016 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      According to the Company's SEC filings, the Company has the technology and plant breeding expertise to regulate the level of nicotine in tobacco plants.  The Company has stated that it is able to grow tobacco with "up to 97% less nicotine than conventional tobacco."

3.      In 2013, the Company announced a partnership with British American Tobacco ("BAT").  BAT was granted access to the Company's "patented technology which alters levels of nicotinic alkaloids in tobacco plants."

4.      However, on September 26, 2017, the *Winston-Salem Journal* reported that BAT was halting its partnership with the Company to develop low-nicotine cigarettes to pursue "more beneficial options available to us going forward."  The article stated in relevant part that "it looks like a company (BAT) that understands the tobacco market perhaps better than any other entity on the planet sees little likelihood of, or viability in, measures to force nicotine levels in cigarettes to a non-psychoactive [and non-addictive] level."

5.      Pursuant to a February 2, 2018 *Seeking Alpha* article by Fuzzy Panda Research, the Company's stock price was inflated through various paid stock promotion articles from 2014 through 2017, some of which had disclosed the paying party and amount, and others which did not.

6.      On this news, the Company's stock fell $0.35 per share or over 11% to close at $2.73 per share on February 2, 2018.

7.      On October 25, 2018, Fuzzy Panda Research disclosed in another *Seeking Alpha* article that its Freedom of Information Act ("FOIA") requests from the SEC for "all documents in the possession of SEC that pertain to investigations regarding 22nd Century Group (XXII) for the time period January 1, 2016 through July 16, 2018" had been denied.

8.      Pursuant to the article, the SEC would not release documents as doing so could "reasonably be expected to interfere with on-going enforcement proceedings."  The article piggy-backed on a March 7, 2018 *Seeking Alpha* article by Sharesleuth that explained how a "stealth promotion network" posted positive articles about the Company at suspicious times in 2017,

including (a) after investors took part in placements and/or warrant exercises, enabling them to profit as the Company's stock price increased; and (b) before and after the Company had announced it was selling new stock at discount prices in October 2017.

9.      On this news, the Company's stock price dropped $0.11 per share or over 4% to close at $2.45 per share on October 25, 2018.

10.     Throughout the Relevant Period, the Company made false and/or misleading statements, as well as failed to disclose that: (a) the Company's stock was prone to manipulation through paid stock promotions; (b) such conduct would subject the Company to heightened regulatory scrutiny by the SEC; and (c) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.

## JURSIDICTION AND VENUE

11.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

14.     ***Plaintiff Melvyn Klein*** ("Plaintiff") is a current owner of 22nd Century stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

15.     ***Nominal Defendant 22nd Century Group*** provides technology that increases or decreases the nicotine levels and other nicotinic alkaloids in tobacco plants, and cannabinoids in hemp/cannabis plants through genetic engineering and plant breeding.   The Company is incorporated in Nevada.  Its principal place of business is in Williamsville, New York.

**Director Defendants**

16.     ***Defendant Henry Sicignano, III*** ("Sicignano") has served as the Company's Chief Executive Officer ("CEO") since March 3, 2015, as President since January 25, 2011, as Secretary from January 25, 2011 to May 27, 2014, as a Director since March 4, 2011, as Chief Operating Officer ("COO") from October 25, 2014 to March 3, 2015, and previously as interim Chief Financial Officer from July 6, 2012 to April 1, 2013.  Defendant Sicignano owns 5,936,457 shares of Company stock, which consists of (a) 2,549,422 shares of common stock, (b) 2,542,347 shares of common stock held by Henry Sicignano III Group, LLC, and (c) 844,688 shares of common stock issuable upon exercise of stock options. 363,844 shares of common stock issuable upon exercise of stock options are not included in the number of beneficially owned shares because they do not vest within 60 days of March 2, 2018.  Defendant Sicignano is Managing Member of Henry Sicignano III Group, LLC and, accordingly, exercises voting and investment power with respect to the shares held by Henry Sicignano III Group, LLC.

17.     ***Defendant Richard M. Sanders*** ("Sanders") has served as a Director since December 9, 2013.  Defendant Sanders is a member of the Audit Committee and the Governance and Nominating Committee.  Defendant Sanders is also the Chair of the Compensation Committee. Defendant Sanders owns 393,376 shares of Company stock, which consists of (a) 55,000 shares

of common stock and (b) 338,376 shares of common stock issuable upon the exercise of stock options.

18.     **_Defendant Joseph Alexander Dunn_** ("Dunn") has served as a Director since March 4, 2011.  Defendant Dunn is a member of the Governance and Nominating Committee.  Defendant Dunn owns 556,323 shares of Company stock, which consists of (a) 107,947 shares of common stock and (b) 448,376 shares of common stock issuable upon the exercise of stock options.

19.     **_Defendant Nora B. Sullivan_** ("Sullivan") has served as a Director since May 18, 2015.  Defendant Sullivan is a member of the Audit Committee and the Compensation Committee. Defendant Sullivan is the Chair of the Governance and Nominating Committee.  Defendant Sullivan owns 316,394 shares of Company stock, which consists of (a) 16,375 shares of common stock and (b) 300,019 shares of common stock issuable upon exercise of stock options.

20.     **_Defendant James W. Cornell_** ("Cornell") has served as a Director since March 4, 2011 and Chairman of the Board since October 25, 2014.  Defendant Cornell is the Chair of the Audit Committee and a member of the Compensation Committee and the Governance and Nominating Committee.  Defendant Cornell owns 616,323 shares of Company stock, which consists of (a) 167,947 shares of common stock and (b) 448,376 shares of common stock issuable upon the exercise of stock options.

21.     Defendants Sicignano, Sanders, Dunn, Sullivan and Cornell are herein referred to as the "Director Defendants."

**Officer Defendant**

22.     **_Defendant John T. Brodfuehrer_** ("Brodfuehrer") has served as the Company's Chief Financial Officer ("CFO") since March 2013 and serves as the Company's Treasurer. Defendant Brodfuehrer owns 633,114 shares of Company stock, which consists of (a) 262,500 shares of common stock and (b) 370,614 shares of common stock issuable upon the exercise of stock options. 150,043 shares of common stock issuable upon exercise of stock options are not included in the number of beneficially owned shares because they do not vest within 60 days of March 2, 2018.

23.     Defendant Brodfuehrer and the Director Defendants are collectively herein referred to as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

24.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

25.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

26.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

27.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

28.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

6

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

29.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and

a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

30.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

31.     The Audit Committee Charter states in relevant part:

**Purpose**

The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of 22nd Century Group, Inc. (the "Company") to appoint, replace and oversee the Company's independent auditor ("Independent Auditor") and to assist the Board in monitoring the systems of internal controls, the integrity of the financial reporting process, and the financial statements and reports of the Company; the performance of the Company's internal audit function; assessing and mitigating business and financial risks to the Company; and the compliance by the Company with legal and regulatory requirements. The Audit Committee shall provide an open avenue for communication among the internal auditors, the Independent Auditor, management of the Company ("Management") and the Board.

\*     \*     \*

**Committee Authority and Responsibilities**
The Committee shall see that the following responsibilities are duly discharged in the manner prescribed by applicable law and regulations of the SEC, the Exchange, the PCAOB and/or other applicable laws and regulations.

1.     The Committee shall have the authority to retain special legal, accounting or other consultants to advise the Committee from time to time, and the Company shall pay the reasonable fees and expenses of any such legal, accounting or other consultants so engaged by the Committee. The Committee may request any officer or employee of the Company or the Company's external legal counsel or Independent Auditor to attend a meeting of the Committee or to meet with any members of, or attorneys, accountants, or consultants to, the Committee.

2.     The Committee shall make regular reports to the Board on its activities, the results of any special investigation conducted by it, and the results of any

work performed by special counsel, accountants or consultants engaged by it. ***The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the public accounting firm, or the performance of the internal audit function***.

3.    The Committee shall be directly responsible for the appointment (or replacement if appropriate), compensation and oversight of the work of any public accounting firm employed by the Company for the purpose of preparing or issuing an audit report or related work, and such Independent Auditor shall report directly to the Audit Committee.

4.    The Committee shall be informed of all disagreements between Management and the Independent Auditor regarding financial reporting and shall be responsible for resolution of any such disputes. The Committee shall report regularly to the full Board of Directors on all actions taken pursuant to this section of the Charter.

5.    The Committee shall review and assure the independence of the firm serving as the Company's Independent Auditor. The Committee shall evaluate annually the performance of the Company's Independent Auditor and shall present its conclusions with respect to the Independent Auditor to the full Board of Directors. Also, this evaluation shall include the review and evaluation of the lead partner of the firm serving as the Independent Auditor. The Company shall not hire the Independent Auditor's lead partner, the concurring partner, or any other member of the audit engagement team of the Independent Auditor who provides more than ten hours of audit, review or attestation services in a position within the Company in a financial reporting oversight role within the one-year period preceding the commencement of audit procedures as a member of the audit engagement team. The term "financial reporting oversight role" shall mean any individual who has direct responsibility for oversight over those people who prepare the Company's financial statements and related information, such as the Management Discussion & Analysis of Financial Condition and Results of Operations ("MD&A") portions of the Company's reports.

6.    No Independent Auditor shall perform any non-audit work for the Company unless expressly authorized to do so by the Audit Committee, pursuant to procedures established for such purpose. The Committee shall approve any non-audit services, including tax services, proposed to be performed by the public accounting firm serving as the Company's principal Independent Auditor, before such services are rendered to the Company. Such pre-approval may be provided by the Chair of the Committee, acting alone and without a meeting of the Committee, to whom pre-approval authority is hereby granted in accordance with the SOX Act and regulations pursuant

thereto; provided that the Chair reports to the Committee at its next meeting on all such pre-approved matters.

7.     Under no circumstances shall the Committee or its Chair approve any non-audit service that is expressly prohibited by Section 201 of the SOX Act. Any non-audit service approved by the Committee or its Chair shall be reported to the Company's shareholders in the next periodic report required to be filed by the Company pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act") and regulations of the SEC.

8.     The Committee shall, at least annually, obtain and review a report by the Company's Independent Auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, respecting one or more independent audits carried out by the firm, and steps taken to deal with any such issues, and (to assess the Independent Auditor's independence) all relationships between the Independent Auditor and the Company.

9.     The Committee shall require that each Independent Auditor that performs an audit for the Company shall timely report to the Audit Committee (i) all critical accounting policies and practices used by the Company; (ii) all reasonably available alternative treatments of financial information within generally accepted accounting principles that have been discussed with Management of the Company, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the public accounting firm; and (iii) other material written communications between the Independent Auditor and Management of the Company, such as any Management letter or schedule of unadjusted differences.

10.    The Committee shall review with Management and the Independent Auditor the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, if any, and pending legal proceedings which may have a material effect on the financial statements of the Company.

11.    The Committee shall review with the Independent Auditors, in advance of the annual audit, their audit scope and plan.

12.    The Committee shall review with Management and the Independent Auditor at the completion of the annual examination of the Company's financial statements:

•      The Company's annual financial statements and related footnotes.
•      The Independent Auditor's audit of the financial statements and the accountants' report thereon.

13.    The Independent Auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting.

- Any significant changes required in the Independent Auditor's audit plan.
- Any serious difficulties or disputes with Management encountered during the course of the audit.
- Other matters related to the conduct of the audit, which are to be communicated to the Committee under generally accepted auditing standards.
- Discuss with the Independent Auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit.

14.    The Committee shall require that no Independent Auditor performing audit services for the Company shall maintain the same person as the lead (or coordinating) audit partner (having primary responsibility for the audit) or the audit partner responsible for reviewing the audit, for more than five (5) fiscal years of the Company. The lead (or coordinating) audit partner shall be subject to reasonable approval by the Committee.

15.    The Committee shall maintain policies for the Company with respect to hiring of employees or former employees of the Independent Auditor in accordance with the rules of the SEC and the Exchange.

***16.    The Committee shall review with Management and the Independent Auditor all interim annual financial reports, including the Company's disclosures under MD&A before they are filed with the SEC or other regulators. Also, the Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee need not discuss in advance each instance in which the Company may provide earnings guidance, and it shall be sufficient that the Committee discuss generally with Management the types of information disclosed by the Company, the manner of disclosure and the types of presentations made by Management to financial analysts and investors.***

17.    In reviewing financial statements that reflect the earnings of the Company, the Committee may make specific inquiry of the Chief Executive Officer and the Chief Financial Officer and can choose to make inquiry of any other relevant officer of the Company regarding the 'quality of earnings' of the Company, from a subjective as well as an objective standpoint. Such review shall occur sufficiently in advance of the required filing date(s) for such reports to allow for meaningful input by the Committee.

18.     The Company shall have an internal audit function. The Committee shall review and concur in the appointment, replacement, reassignment, or dismissal of the chief audit executive who shall have a direct reporting line to the Chair of the Committee and shall be at liberty to advise the Chair as to any matter of concern with regard to the financial integrity of the Company and other matters under the purview of the Committee.

19.     The Committee shall periodically inquire of Management, the chief audit executive and the Independent Auditor about significant risks or exposures facing the Company, assess the steps Management has taken or proposes to take to minimize such risk to the Company, periodically review compliance with such steps and discuss policies with respect to risk assessment and risk management.

20.     The Committee shall review and discuss with Management, the Independent Auditor and the chief audit executive:

   •     The adequacy of the Company's internal controls including computerized information system controls and security.
   •     Review with the Chief Executive Officer, the President and the Chief Financial Officer, prior to giving their quarterly certifications, any significant deficiencies and material weaknesses in the design or operation of internal controls.
   •     Any related significant findings and recommendations of the Independent Auditor and internal audit services, together with Management's responses thereto.
   •     Any difficulties encountered in the course of their audits, including any restrictions on the scope of their work or access to required information, together with Management's responses thereto.
   •     Any changes required in the planned scope of their plan.
   •     The internal auditing budget, staffing and mandate.

21.     The Committee shall review the legal and regulatory matters that, in the opinion of Management, may have a material impact on the financial statements, related Company compliance policies, and programs and reports received from regulators.

22.     The Committee shall periodically review the Company's Code of Ethics with the Company to ensure that it is adequate and up-to-date. The Committee also shall monitor compliance with the Company's Code of Ethics.

23.     The Committee shall establish (or ensure that there are established) procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting

controls, or auditing matters, and (b) the confidential, anonymous submission directly to the Committee by employees of the Company or other parties as to concerns regarding questionable accounting or auditing matters.

24.     The Committee shall review policies and procedures with respect to officers' expense accounts and perquisites, including their use of corporate assets, and consider the results of any review of these areas by the internal auditor or the Independent Auditor.

25.     The Committee shall prepare or cause to be prepared the Audit Committee Report for the Company's Annual Report and proxy statement.

26.     The Audit Committee shall review all related person transactions or series of similar transactions and provide pre-approval or ratification of the same pursuant to a Related Person Transaction Policy. In addition, the Audit Committee shall review and assess the adequacy of any Related Person Transaction Policy annually and adopt any changes it deems necessary.

27.     The Committee shall create and approve an agenda for the ensuing year.

28.     The Committee shall review this Charter at least once annually for the purpose of assessing the adequacy of this Charter and recommend any proposed changes to the Board of Directors, and shall perform an annual evaluation of its performance.

(Emphasis added).

## THE COMPANY'S CODE OF BUSINESS CONDUCT AND CORPORATE ETHICS

32.     The Company's Code of Business Conduct and Ethics states in relevant part:

**Timely and Truthful Public Disclosure.**

In reports and documents filed with or submitted to the Securities and Exchange Commission and other regulators by the Company, and in other public communications made by the Company, the Covered Parties involved in the preparation of such reports and documents (including those who are involved in the preparation of financial or other reports and the information included in such reports and documents) shall make disclosures that are full, fair, accurate, timely and understandable. Where applicable, these Covered Parties shall provide thorough and accurate financial and accounting data for inclusion in such disclosures. They shall not knowingly conceal or falsify information, misrepresent material facts or omit material facts necessary to avoid misleading the Company's independent public auditors or investors.

*       *       *

13

**Accountability for Violations**

If the Company's Board of Directors determines that this Code has been violated, either directly, by failure to report a violation, or by withholding information related to a violation, the offending Covered Party may be disciplined for non- compliance with penalties up to and including removal from office or dismissal. Such penalties may include written notices to the individual involved that a violation has been determined, censure by the Board of Directors, demotion or re-assignment of the individual involved and suspension with or without pay or benefits. Violations of this Code may also constitute violations of law and may result in criminal penalties and civil liabilities for the offending Covered Party and the Company. All Covered Parties are expected to cooperate in internal investigations of misconduct.

## BACKGOUND AND THE COMPANY'S FALSE STATEMENTS

33.     On February 18, 2016, the Company filed a Form 10-K with the SEC (the "2015 10-K"). The 2015 10-K was signed by Defendants Sicignano and Brodfuehrer. The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

34.     The 2015 10-K stated that its stock price was subject to volatility. However, it failed to disclose its stock could experience volatility due to manipulation:

Our stock price may be highly volatile and could decline in value.

Our common stock is currently traded on the NYSE MKT and the market prices for our common stock have been volatile. Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors . . . may have a significant impact on the market price of our common stock:

- results from and any delays in any clinical trials programs;
- failure or delays in entering potential products into clinical trials;
- failure or discontinuation of any of our research programs;
- delays in establishing new strategic relationships;
- delays in the development of our potential products and commercialization of our potential products;
- market conditions in our sector and issuance of new or changed securities analysts' reports or recommendations;

14

- general economic conditions, including recent adverse changes in the global financial markets;
- actual and anticipated fluctuations in our quarterly financial and operating results;
- developments or disputes concerning our intellectual property or other proprietary rights;
- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and
- equity sales by us of our common stock or securities convertible into common stock to fund our operations.

35.     On March 8, 2017, the Company filed a Form 10-K with the SEC (the "2016 10-K").  The 2016 10-K was signed by Defendants Sicignano and Brodfuehrer.  The 2016 10-K contained signed SOX certifications by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The Company's 2016 10-K stated that "management concluded that our internal control over financial reporting was effective as of December 31, 2016."

36.     The Company's 2016 10-K stated that its stock price was subject to volatility. However, it failed to disclose its stock could experience volatility due to manipulation:

Our stock price may be highly volatile and could decline in value.

Our common stock is currently traded on the NYSE MKT and the market prices for our common stock have been volatile.  Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- results from and any delays in any clinical programs;

- failure or delays in entering potential products into clinical trials;
- failure or discontinuation of any of our research programs;
- delays in establishing new strategic relationships;
- delays in the development of our potential products and commercialization of our potential products;
- market conditions in our sector and issuance of new or changed securities analysts' reports or recommendations;
- general economic conditions, including recent adverse changes in the global financial markets;
- actual and anticipated fluctuations in our quarterly financial and operating results;
- developments or disputes concerning our intellectual property or other proprietary rights;
- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and
- equity sales by us of our common stock or securities convertible into common stock to fund our operations.

37. On March 7, 2018, the Company filed a Form 10-K with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Sicignano and Brodfuehrer. The 2017 10-K contained signed SOX certifications by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Company's 2017 10-K stated that "management concluded that our internal control over financial reporting was effective as of December 31, 2017."

38. The Company's 2017 10-K stated that its stock price was subject to volatility. However, it failed to disclose its stock could experience volatility due to manipulation:

Our stock price may be highly volatile and could decline in value.

16

Our common stock is currently traded on the NYSE American and the market prices for our common stock have been volatile. Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- failure or discontinuation of any of our research programs;
- delays in establishing new strategic relationships;
- delays in the development of our potential products and commercialization of our potential products;
- market conditions in our sector and issuance of new or changed securities analysts' reports or recommendations;
- general economic conditions, including recent adverse changes in the global financial markets;
- actual and anticipated fluctuations in our quarterly financial and operating results;
- Developments or disputes concerning our intellectual property or other proprietary rights;
- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and
- equity sales by us of our common stock or securities convertible into common stock to fund our operations.

39. The statements above were false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects that: (a) the Company's stock was prone to manipulation through paid stock promotions; (b) such conduct would subject the Company to heightened regulatory scrutiny by the SEC; and (3) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH SLOWLY EMERGES

40.     On February 2, 2018, *Seeking Alpha* contributor *Fuzzy Panda Research* stated that the Company utilized a years' long "[r]ampant paid stock promotion" scheme to inflate its share price.  Pursuant to the article, the sponsors of some of the articles from 2014 through 2017 were undisclosed.  The article stated in pertinent part:

### 22nd Century -- Cutting Through The Smoke And Hype -- 75% Downside Summary

- Reverse merger into mining shell; headquarters is located at a dentist office.
- Negative gross margins - so revenue growth equals increased losses.
- Rampant paid stock promotion (including free stock for buying cartons of cigarettes).
- "Technology" viewed as worthless by Major Tobacco + all companies, but XXII has a low nicotine product. Low nicotine tobacco has been around since the 1930s!
- Sea of red flags + consistent exaggeration about technology.

*     *     *

The company has spun the narrative that "22nd Century is the only company in the world capable of growing tobacco with non-addictive levels of nicotine" -- (Source).  We will show you this is far from the truth and prove to you that this is likely nothing more than another paid stock promotion that will crumble under shareholder dilution.

Our analysis of 22nd Century will focus on three realities that you won't find in its press releases.

1.  Dismantling the hype of 22nd Century's "Technology" –

- In reality XXII is the only tobacco company that can't publicly market and sell a low nicotine tobacco product in the USA right now.
- Removing nicotine from tobacco is not new or novel; in fact it was first discovered in the 1930s! Multiple major tobacco companies have 2-5 times more patents than XXII in the low-nicotine space (XXII has <1% of the patents).
- British American Tobacco (NYSEMKT: BTI) (BAT) put a nail in XXII's coffin by deciding that XXII patent portfolio isn't even worth $3 million!
- The only two product hopes for XXII have already FAILED: Brand A cigarettes FAILED in December 2016 to get their FDA Modified Risk Tobacco Product (MRTP) designation; and X-22 FAILED phase IIb trials back in 2012. Neither product even currently has new applications/research studies pending.

18

2. XXII's Horrible Fundamentals -- Great businesses are not usually reverse mergers of OTC mining companies run out of dentist office that give away free stock with every pack of cigarettes sold -- it turns out XXII is not an exception to this rule.

- NEGATIVE GROSS MARGINS -- 22nd Century generates $0.93 of revenue for every $1.00 of product costs . . . a terrible business model.
- LESS than 2% of the company's revenue comes from low nicotine tobacco (and that revenue is declining!).
- Where does the revenue come from then? - 98.5% of revenue from selling the highest nicotine cigarettes in the USA (Red Sun) and third-party normal cigars and cigarettes.
- Company burning over ~$12 million of cash a year.
- Huge stock dilution - Share count up by >600%

3. Red Flags Galore - Who is protecting shareholders?

- Founder & Former CEO Joseph Pandolfino charged with share price manipulation by SEC and got an FTC consent order for FALSE advertising.
- Joe, the founder with an SEC and FTC order, accused current management of corporate governance concerns.
- Paid stock promoters involved and company gave away shares when you bought cigarettes.
- Headquarters shared with a local dentist!
- Reverse merger into OTC mining company.
- Insider sales & institutional investors dumping shares and warrants from six months ago.
- Bankers (Chardan), investor relations (IRTH), and auditors (Freed Maxick) all have a very checkered past where investors have gotten fleeced.

\*          \*          \*

Paid stock promotion is commonplace in penny stocks similar to XXII and is a great indicator of good short candidates. Why? We believe legitimate companies do not pay stock promoters!

**Partial list of the Paid Stock Promotions**:

## XXII Paid Stock Promotions! (Partial List)

| Stock Promoter | Date | Amount | Paying Party | Title |
|---|---|---|---|---|
| Small Cap Network | 10/23/2017 | undisclosed | undisclosed | 22nd Century Group Inc (XXII) - Smoke and a Pancake? |
| Small Cap Traders | 9/19/2017 | undisclosed | undisclosed | Daily Trader Update |
| The Stock Expert.com | 8/4/2017 | $32,500 | Sunrise Media | Long Term Play Watch: XXII Hits New 52 Week High Up |
| Road Runner Stocks (Inv | 8/3/2017 | undisclosed | undisclosed | *The corner of High and Main...* |
| The Stock Expert.com | 6/16/2017 | $12,500 | Sunrise Media | XXII Makes Gains Of 12% After Our Alert |
| Small Cap Traders | 6/8/2017 | Unpaid? | undisclosed | "A New Century in Bio-engineering" |
| Road Runner Stocks (Inv | 5/15/2017 | undisclosed | undisclosed | |
| Stock Trade Wire | 6/22/2016 | $2,000 | Infinity Consulting, LLC | Red Hot Mega Pick - $XXII |
| Small Cap IR | 5/26/2016 | $25,000 | Star Media | XXII just in product to be placed in 750 retail stores |
| Small Cap Leader | 5/24/2016 | $20,000 | Third Coast Media | 22nd Century Group, Inc.(XXII) is our new NYSE alert |
| Stocks Impossible | 5/24/2016 | $25,000 | Star Media | Could this one be a takeover target? |
| Ultimate Stock Alerts | 1/28/2016 | $20,000 | Star Media | NYSE Alert |
| Street Picks | 1/24/2016 | $15,000 | Star Media | Update 22nd Century Group and this week |
| Small Cap Leader | 1/20/2016 | $15,000 | Star Media | Extremely quick FDA response NYSE profile inside |
| First Penny Picks | 12/17/2015 | $10,000 | Star Media | XXII medical marijuana collaboration and more |
| Small Cap Leader | 12/16/2015 | $15,000 | Star Media | XXII News Update |
| AwesomeStocks.com | 12/16/2015 | $20,000 | Star Media | Trade Idea: 22nd Century Group, Inc. (NYSE: XXII) |
| Blazing Penny Stocks | 4/23/2015 | undisclosed | undisclosed | Is This Cigarette the Future of Smoking? |
| Pennybuster.com | 9/9/2014 | undisclosed | undisclosed | ***** XXII Huge News ***** |
| pennystockprophecy | 3/6/2014 | undisclosed | undisclosed | ****XXII*** |
| **Total Spent** | | **$212,000** | | |

41.     On this news, the Company's stock price dropped $0.35 per share or over 11% to close at $2.73 per share on February 2, 2018.

42.     On October 25, 2018, *Seeking Alpha* contributor *Fuzzy Panda Research* suggested the SEC is actively investigating the Company for its involvement in a potential pump and dump scheme.

43.     Pursuant to the article, the SEC refused to provide documents pursuant to a FOIA request that concerned investigations of the Company from January 1, 2016 through July 16, 2018 because doing so "could reasonably be expected to interfere with on-going enforcement proceedings."[1]  The article stated in pertinent part:

**22nd Century Group -- FOIAs Reveal Suspected Undisclosed SEC Investigation Summary**

---

[1]     The SEC cited FOIA exemption 5 U.S.C. § 552(b)(7)(A), 17 C.F.R. § 200.80(b)(7)(i).

- Our FOIA requests on 22nd Century Group received a 7(a) exemption response including the line "releasing the withheld information could reasonably be expected to interfere with on-going enforcement proceedings". As a result, we suspect there is an ongoing SEC investigation regarding the company.
- Sharesleuth exposed articles from network of connected authors promoting XXII – those authors also wrote about many other "IRTH Communications" & "Honig, Brauser, and Frost" companies.
- Still no MRTP (Modified Risk Tobacco Product) application!

*     *     *



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612                                                                September 21, 2018

Re:     Appeal, Freedom of Information Act Request No. 18-02520-FOIA, designated on appeal as No. 18-00609-APPS

Dear

This responds to your Freedom of Information Act (FOIA) appeal of the FOIA Officer's denial of your July 16, 2018 FOIA request for "all documents in the possession of SEC that pertain to investigations regarding 22nd Century Group (XXII) for the time period January 1, 2016 through July 16, 2018." By letter dated August 13, 2018, the FOIA Officer denied your request pursuant to FOIA Exemption (b)(7)(A). On September 14, 2018, you filed this appeal challenging the FOIA Officer's invocation of Exemption 7(A). I have considered your appeal and it is denied.

I have determined that the FOIA Officer correctly asserted Exemption 7(A).[1] There is a two-step test to determine whether information is protected under Exemption 7(A), whether: (1) a law enforcement proceeding is pending or prospective, and (2) release of information about it could reasonably be expected to cause some articulable harm.[2] We have confirmed with staff that releasing the withheld information could reasonably be expected to interfere with on-going enforcement proceedings.[3]

---

[1] Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information * * * could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A), 17 C.F.R. § 200.80(b)(7)(i).

Sources – Letter from the SEC Office of the General Counsel (we redacted the Name & Address it was mailed to & the highlights are our additions); Initial SEC FOIA denial; More information on 7 (A) exemptions.

*　　*　　*

Alleged Undisclosed Stock Promotion for XXII – An IRTH Communications client:

Since we wrote our earlier article on XXII, Chris Carey at Sharesleuth wrote a damning exposé of a large network of often undisclosed stock promotions that included the creation of fictitious authors.  22nd Century (XXII) was a constant focus of these authors' bullish articles: see Sharesleuth's Pretenders & Ghosts:

Stealth Promotion Network article.  This should be required reading for anyone considering investing in XXII, either long or short.

The article suggests how the same authors (sometimes fictitious people) wrote a multitude of bullish investment articles for both IRTH Communication clients & companies backed by Barry Honig, Michael Brauser, and Philip Frost. Since Sharesleuth's article was published, the SEC filed charges (link) against Barry Honig, Michael Brauser, Philip Frost, John H. Ford, et al. for allegedly running pump & dumps and manipulating the stock price of 3 specific companies (assumed to be MBVX, COCP, and MGTI).  MBVX was also written on extensively by Samuel Rae, an author of many of the past bullish XXII pieces in 2017 (here & here). John H. Ford, who was charged by the SEC and has already settled the charges (link), was also an author of a positive article on XXII (it has since been removed from SeekingAlpha.com).

Highlights of the Sharesleuth article involving 22nd Century Group include:

- Fake authors like George Ronan writing positive XXII stories.  This fake author is shown to have 3 different profile pictures & bios for different investment sites, but despite his multiple fictitious personalities, he is bullish on XXII.
- Lack of disclosure -- authors like Samuel Rae did not disclose if they were compensated for or had positions in the stocks. If they were indeed compensated then this lack of disclosure would violate the law.
- Exposed a network of connected authors for XXII (they produced more than 20 positive stories in 2017 alone). Sharesleuth's list of XXII promotional articles is here. Authors were shown to write positive articles about IRTH Communications or Honig-related companies and often right before events like stock offerings.

22

The exposé of this network of promotional authors is especially important given that last year, the SEC brought enforcement actions against 27 different firms & individuals for stock promotion schemes that led investors to believe they were reading independent, unbiased analyses. (SEC charges) 22nd Century's management has still not explained who authorized or funded the positive articles regarding XXII. Nor has it provided any reasoning for who else could be responsible for these tactics of having fake authors write positive articles.

Furthermore, XXII continues to pay & use IRTH Communications as their investor relations firm. IRTH Communications is still listed as 22nd Century's IR contact on their website & in press releases (link, and link) -- even as it sits at the epicenter of these articles.



Despite having extraordinarily long quarterly calls in which management talks about hypothetical future licensing deals, 22nd Century has not bothered to offer an explanation for why XXII has consistently been the subject of positive articles from this network of authors or other paid stock promotions.

44.    On this news, the Company's stock dropped $0.11 per share or over 4% to close at $2.45 per share on October 25, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

45.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

46.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

47.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

48.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

49.     The Company Board is currently comprised of five (5) members – Sicignano, Sanders, Dunn, Sullivan and Cornell.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

50.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

51.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

52.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

53.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

54.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Sicignano**

55.     Defendant Sicignano is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all his income from his employment with the Company, making him not independent.  As such, Defendant Sicignano cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

56.     Defendant Sicignano is also a defendant in the securities class action complaint entitled *Bull v. 22nd Century Industries, Inc., et al.*, Case 1:19-cv-00409 (E.D.N.Y.) ("Securities Class Action").

**Defendants Sanders, Sullivan and Cornell**

57.     During the Relevant Period, Defendants Sanders, Sullivan and Cornell served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

58.     Defendants Sanders, Sullivan and Cornell breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false

and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Sanders, Sullivan and Cornell face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**COUNT I**

**<u>Against the Director Defendants for Breach of Fiduciary Duty</u>**

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

61.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

62.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

64.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

26

## COUNT II

### <u>Against the Director Defendants for Waste of Corporate Assets</u>

65.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

66.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

67.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

68.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

69.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III
### <u>Against Defendants for Violations of Section 10(b)<br>of the Exchange Act and SEC Rule 10b-5</u>

70.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71.     During the Relevant Period, Defendants disseminated or approved public statements that misrepresented or failed to disclose that (a) the Company's stock was prone to manipulation through paid stock promotions; (b) such conduct would subject the Company to heightened regulatory scrutiny by the SEC; and (3) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

72.     As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT IV

### Against the Director Defendants
### for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

74.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) the Company's stock was prone to manipulation through paid stock promotions; (b) such conduct would subject the Company to heightened regulatory scrutiny by the SEC; and (3) the Company's public statements were false and misleading and/or lacked a reasonable basis at all relevant times.

76.    In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy were materially false and misleading.

77.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

78.     The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 30, 2019

**GAINEY McKENNA & EGLESTON**


By:  */s/ Gregory M. Egleston*
        Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, MELVYN KLEIN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of 22nd Century Group and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder of 22nd Century Group common stock.

Dated: January 30, 2019

MELVYN KLEIN